**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **J. A., BY AND THROUGH D. J.,** **Plaintiffs,** | ) | |
| **v.** | ) | **Case No.:** |
| **COBB COUNTY SCHOOL DISTRICT** **Defendants.** | ) | |

**COMPLAINT**

**COMES THE PLAINTIFFS,** J.A., by and through his parent, D.J., filing this Complaint against Cobb County School District. They show:

## I. PARTIES, JURISDICTION AND VENUE

1. J.A.. resides with his mother, D.J., in Cobb County, Georgia. J.A. has a qualifying disabilities under the Individuals with Disabilities Education Act ("IDEA") that adversely impacts his education and requires special education.

2. Cobb County School District ("CCSD") is the legal entity charged with administering public education to students in Cobb County, Georgia. It receives state and federal funding to provide special education to persons with a disability under the IDEA.

3. Jurisdiction is conferred upon this Court by the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b), as Plaintiffs reside within the Northern District of Georgia and all events and omissions giving rise to this Complaint occurred in this judicial district.

5. Administrative exhaustion of the underlying case (2442377-OSAH-DOE-SE-33-Woodard) occurred through a state due process hearing with a Final Order by Administrative Law Judge ("ALJ" or "state hearing officer") M. Patrick Woodard dated November 6, 2024. This appeal is timely brought within ninety (90) days after the issuance of the Final Order in the administrative proceeding issued November 6, 2024.

## II. INTRODUCTION

6. J.A. was born on September 13, 2009 and he is currently 15 years old. He attends Cobb County Schools and has an Individualized Education Program. J.A. experiences symptoms as a result of his Level 2-Autism Spectrum Disorder, Post-Traumatic Stress Disorder/Anxiety, Attention Deficit Hyperactivity Disorder, Medication Induced Tics, Ocular Migraines, and Insomnia that adversely impact his education.

7. J.A.'s eligibility during the time periods relevant to the due process hearing, J.A. was under the categories of Autism and Other Health Impairment (OHI) categories. His OHI eligibility was based on diagnoses of ADHD, anxiety, depression, and PTSD.[1]

---

[1] D.J. explained that J.A. developed PTSD after seeing his older sister die in their home when he was two years old.

8. At a May 5, 2022 IEP meeting the team added 30 minutes per week of "consultative services" to J.A.'s IEP due to his behavioral issues. According to David Gallant, J.A.'s case manager for the 2023-2024 school year, "consultative services" involves "touch and go services" including "check-in, make sure he's doing what he's supposed to do. You know, looking at his goals, that kind of thing."

9. The following August of 2022 Dr. Kimberly Saye performed a psychological-educational evaluation for J.A. It noted, J.A.'s tendency to respond impulsively; struggles recalling information and generating multiple responses to problem; frequently getting "stuck" when things did not go the way J.A. expected or when he encountered difficult problems which impaired his social functioning; and, multiple characteristics of Autism, particularly noting that J.A. never used a normal social greeting with her and would stand in the middle of her office until she told him to take a seat at the table. Dr. Saye found that J.A. met the criteria for Autism Spectrum Disorder, displaying "a high level of autism spectrum-related symptoms." The testing revealed J.A.'s socialization skills in the first percentile.

10. On August 31, 2022, J.A. "hit another student two times with his laptop, drop kicked the student, shoved him into a wall, and kicked him." An manifestation review meeting regarding the incident was held on September 12, 2022. It was determined that the incident was a manifestation of J.A.'s suspected disability, and he was suspended for ten days.[2]

---

[2] When a school district, the parent, and relevant members of the IEP Team determine that the conduct was a manifestation of the child's disability, the IEP Team <u>must</u>—(1) Either—(i) Conduct a functional behavioral assessment, unless the LEA had conducted a

11. Following the August 2022 disciplinary incident, another functional behavior assessment ("FBA") was initiated in November of 2022, with data collected by JA's teachers *from January 23 through February 3, 2023*. This FBA targeted the areas of "Refusal," "Out of Area," and "Physical Aggression." Based upon the data collected, the evaluator concluded that Refusal had a function of escape/avoidance. However, because the behaviors of Physical Aggression and Out of Area only occurred twice each during the 10-day evaluation period, CCSD claimed there was not enough information to determine a function for those behaviors. The evaluator recommended revising J.A.'s current BIP and continuing to monitor his issues with Out of Area and Physical Aggression, and consider using a Positive Support Plan to target those behaviors.

12. The IEP meeting required from the August 2022 incident manifestation determination was held on March 27, 2023, in order to update J.A.'s IEP and BIP following the eventual completion in February 2023 of the FBA. The team agreed to update J.A.'s IEP and BIP to add 30 minutes per week of "direct instruction on social skills lessons," which would involve instructions on social skills such as "initiating conversation with peers, asking to join a group, accepting

---

functional behavioral assessment before the behavior that resulted in the change of placement occurred, and implement a behavioral intervention plan for the child; or(ii) If a behavioral intervention plan already has been developed, review the behavioral intervention plan, and modify it, as necessary, to address the behavior; and(2) Except as provided in paragraph (g) of this section, return the child to the placement from which the child was removed, unless the parent and the LEA agree to a change of placement as part of the modification of the behavioral intervention plan.
34 CFR §300.530

no, etc." In its place J.A. was served with spending time playing chess with a teacher once a week. This *ad hoc* intervention program did not improve J.A.'s social skills. The data collection, monitoring and review for this intervention is telling of its design.

13. On April 12, 2023, a Manifestation Determination Review ("MDR" meeting was held to address a behavioral incident that occurred on March 29, 2023, in which J.A. accessed pornographic images on his District-issued laptop and showed them to other students. J.A.'s grandparents asserted that the incident was a result of J.A.'s autism: due to his poor social skills, J.A. sometimes acts out in order to make friends. The District team members responded absurdly that these issue were being addressed through aforesaid chess-playing-with-an-adult social skills lessons. The team determined that the behavior was not a manifestation of J.A.'s disabilities, and he was suspended for two days.

14. An IEP meeting was held for J.A. on November 1, 2023. At the meeting teachers reported that J.A. kept to himself and reported significant issues with getting J.A. to complete assignments both during and outside of class. Multiple teachers noted that, if he turned in homework assignments, they were completed in someone else's handwriting. Some of his teachers also noted that he appeared "lonely and sad" during the day. J.A.'s two goals involving social skills and classroom transitions were removed, leaving only his goals regarding work completion. The IEP team agreed to continue J.A.'s 30 minutes per week of social skills work and 30 minutes per week of consultative services for the remainder of

eighth grade. There were no specific goals related to social skills in J.A.'s IEP. The team decided that J.A. could meet his social needs through participating in clubs, including chess club, once he started high school (effectively determining that he needed nothing more than what typical, non-special education students received.

15. But the chess playing would continue as an intervention for some purpose. The team continued this model of social skill work after discussing it with J.A.'s previous case manager, who stated, without any evidence, that the approach was "super successful." J.A. never played chess with any peers.

16. J.A.'s transition plan included in his November 2023 IEP noted that he was interested in pursuing a career in technology after graduation. However, none of his transition instruction and goals involved the use of computers or technology.

17. On February 28, 2024, J.A. installed a password-stealing software called Mimikatz on his District-issued laptop. As a result of this incident, J.A. was initially suspended for eight days. Another MDR meeting was held *46 days later* on April 16, 2024. The MDR team concluded that J.A.'s actions were not a manifestation of his disability and he was suspended for the rest of the 2023-2024 school year. In so doing the Defendant's MDR squad overruled one explanation from a licensed psychologist:

> If, say for example, children with autism who tend to have the OCD2, they are so -- they're hyper-focused on a specific thing, which it can be computers, trains, whatever. So with him being hyper-focused the theory of mind of people on the spectrum, they can't stop just like say

> you or I can. They're compulsion and the obsession overrides what he should do.

18. Counsel for J.A. attempted to present portions of the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), during the MDR meeting. The school refused to consider any information from the DSM-5 regarding the traits of autism spectrum disorder that counsel for the family attempted to present at the MDR meeting, basing its ignorance on the theory that eligibility for special education services is based on criteria put forth by the Georgia Department of Education, not the DSM-5. Of course this was not an eligibility meeting.

19. By law the Defendant was required to continue providing special education services, without any exception. Though the District claims to have attempted to schedule an IEP meeting to determine what J.A.'s services would look like while he was suspended, the family told the District that they would not attend another IEP meeting. This never prevented the District from having a meeting in the parents absence, but the Defendant chose not to meet. A teacher met with J.A. twice a week, seemingly to work on his IEP goals and objectives while J.A. was suspended, but supposedly the suspension prevented the Defendant from working on all of J.A.'s IEP goals.

20. On May 13, 2024, the District sent D.J. a letter informing her that, pursuant to the District's "Technology Acceptable Use" policies, the District was revoking J.A.'s use of all District technology and network resources, and that the

revocation would apply for the remainder of J.A.'s enrollment with the District. The letter further explained that this meant that J.A. would not have access to the District network; would not receive a District-issued laptop or other technology device; would not be allowed to bring a personal technology device (including laptops, tablets, cellphones, external hard drives, and Wi-Fi hotspots) on District property for any reason, unless provided written permission at a later date; and would not be allowed to use other students' technology devices on campus.

21. In affirming the Defendant's conduct the ALJ compounded prior so-called technology incidents, such as "using another student's laptop"; "refusing to complete a laptop assignment"; and, work refusal where J.A. was said to only be interested in "being on his computer".

22. J.A. (a child with disabilities) was denied a free appropriate public education ("FAPE") when Cobb County failed to provide adequate supervision, services, supports, and accommodations in his individualized education program ("IEP") that caused alleged violations of the Defendant's student code of conduct.

23. Cobb County School District predetermined the outcome of J.A.'s procedural protection of a manifestation determination review.

24. CCSD subsequently reduced the supervision, services, supports and accommodations in J.A.'s Individualized Education Program.

25. CCSD declined to consider consequences other that exclusionary discipline and punishment for J.A.

26. CCSD further insisted on threatening to refer this student with disabilities for criminal prosecution.

27. CCSD and J.A.'s school, Barber Middle School, has disproportionately suspended students with disabilities at higher rates that their non-disabled peers. For example the Georgia Department of Education's most recent data from 2022 shows that students who receive special education services were suspended at a rate of 17% whereas their non-disabled peers were only suspended at 10% (https://gaappleseed.org/resource/find-my-schools-suspension-rate/).

## III. FACTUAL ALLEGATIONS

28. J.A. has exhibited persistent issues with completing school assignments and participating appropriately in the classroom. He has also struggled to form friendships and interact appropriately with peers.

29. On February 28, 2024, the Cobb County School District alleged that, because of their inadequate supervision and insufficient computer system protocols, J.A., a child with disabilities, was able to install password stealing software on his CCSD laptop, there were additional unauthorized programs installed that were designed to reset restrictions and posed serious security threats to district data and resources, and students' personal information was compromised..

30. Cobb County School District failed to provide sufficient computer system protocols despite a history of technology based infractions (including, but not limited to occurrences on February 14, 2022 and March 29, 2023; Cobb County

School District failed to effectively address these with J.A. or take even basic steps such as performing a Functional Behavioral Assessment for the purpose of addressing this serious problem behavior or implementing a Behavioral Intervention Plan to address technology violations as required by law.

31. There is no evidence that Cobb County School District adhered to its own policy at IFBG-R Technology Acceptable Use of…providing an internet filtering device which shall be used to block or filter access to inappropriate information and materials on the internet, in electronic mail or other forms of electronic communications (pg.1); and Students should be supervised by instructional personnel when accessing network and internet resources…(pg. 2). In accordance with JCDA-R Student Code of Conduct states in relevant part…Relevant factors to be considered should include, but not limited to the age, maturity level, willfulness and intent, and the cognitive ability of the student (pg.1).

32. On April 19, 2024, the Cobb County School District held J.A.'s Manifestation Determination Review ("MDR"). They declined to even consider any widely accepted DSM-5 symptom evidence related to any of J.A.'s disabilities.

33. During the MDR, all IEP members that were not related to J.A., believed that his behavior *was not* related to symptoms of his disabilities even though clear and convincing evidence provided by the school's own records and psychoeducational evaluation proved otherwise. While the members stated his behavior was unrelated to symptoms of his disabilities, they were unable offer an explanation of what did prompt his behavior.

34. At the conclusion of the MDR, all IEP members that were not related to J.A. reduced his services hours from two hours to one hour despite the obvious need for more intensive services, supports and accommodations, not less. Moreover, none of these members provided and documentation or data that supported their unanimous and unilateral predetermined decision to reduce his services.

35. The reduction in services was not data driven, but instead a function of administrative convenience.

36. On April 23, 2024, the CCSD was unwilling to consider any of the eight (8) proposals for rehabilitative consequence offered by the parents that included (a) apology and explanation; (b)-community service; (c)-education and training; (d)- mediation/dialogue; (e)-collaborative project; (f)-mentoring/support; (g)-probation/monitoring; and/or, (h)-participation in cybersecurity awareness campaigns.

37. On April 29, 2024, CCSD was unwilling to agree to a tribunal waiver unless it included referring J.A. to juvenile court.

38. On May 3, 2024, CCSD denied subpoenas for the tribunal and hence J.A. was unable to fully and fairly defend himself in the tribunal process.

39. On May 13, 2024, CCSD unjustly revoked J.A.'s access to all technology for the remainder of his academic career, effectively crippling his ability to participate in the IEP transition plan designed to prepare him for a career in

computers and technology, a blatant disregard for his educational and developmental needs.

## IV. LEGAL CLAIMS

40. CCSD failed to provide J.A. a free, appropriate public education ("FAPE").

41. Among other things, CCSD was required to provide J.A. sufficient behavioral support, including a properly designed and monitored behavior intervention plan, to access his education.

42. By not providing adequate supervision of J.A. while using technology and/or not utilizing sufficient computer system protocols, the District failed to prevent J.A. from installing password stealing software on his District-issued laptop.

43. Despite J.A.'s history of technology related infractions, the District failed to take steps, such as performing an FBA and/or implementing a BIP, to address this behavior.

44. The ALJ incorrectly concluded that an FBA was not warranted, likening J.A. to a student that may have occasional behavioral problems. This is irreconcilable with the ALJ's other conclusions expressing "concern"

> "that the District has taken few steps to address J.A.'s pattern of inappropriate and often aggressive behavior. When J.A.'s 2023 FBA failed to provide the District with sufficient data to determine how to address J.A.'s behavioral concerns, the District did not take any steps to address those behaviors. The Court fails to understand why this absolved the District of its

> obligation to provide J.A. with services and accommodations to address his behavioral issues. The District could have extended the FBA observation period to take additional data, or simply provided additional services to J.A.'s IEP without such data. There is also no explanation in the record for the District's decision to remove two of J.A.'s IEP goals during his eighth-grade year. However, the allegation regarding behavioral supports contained in Petitioners' Complaint was very narrow: they alleged that "Cobb County School District failed to provide sufficient computer system protocols despite history of technology-based infractions on 2/14/2022 and 3/29/2023; Cobb County School District failed to effectively address those with [J.A.] (a child with disabilities) or take even basic steps such as perform a Functional Behavioral Assessment for the purpose of addressing this serious problem or implementing a Behavioral Intervention Plan to address technology violations as required to comply with the law." (Petitioners' Due Process Complaint)(emphasis added). Because the Petitioners failed to include any claims regarding the District's approach to J.A.'s behavioral issues that were not related to technology, those claims are beyond this Court's jurisdiction.

This was erroneous on the ALJ's part because the Plaintiff's due process complaint was sufficient to alert the Defendant and the ALJ of its claim and thus the ALJ had plenty of jurisdiction to hear and rule as a matter of law, not just dicta.

45. The IEP inadequately identified J.A.'s behavioral impediments and did not use professional, evidence-based strategies to address that behavior.

46. At the April 2024 MDR meeting, the District IEP team members improperly determined that J.A.'s behavior was not related to his disabilities.

47. The District conducted J.A.'s April 2024 MDR meeting improperly by failing to allow his family to consider any evidence from the DSM-5 related to J.A.'s disabilities and the ALJ incorrectly determined it would have been "irrelevant."

48. CCSD failed to honor of the procedural protections of the IDEA in its MDR.

49. CCSD predetermined J.A.'s placement, IEP, related services and accommodations and the outcome of J.A.'s April 2024 MDR meeting was predetermined by the District.

50. Following the MDR meeting, the District improperly failed to provide J.A. special education and reduced J.A.'s service hours. This decision was predetermined by the District.

51. CCSD failed to offer students, and J.A. in particular, a continuum of placements as required by the IDEA.

52. CCSD failed to develop an appropriate IEP.

53. CCSD denied J.A. meaningful participation in his IEP transition plan and undermined his preparation for a career in computers and technology.

54. CCSD's FERPA violations were connected to discriminatory intent and/or practices that disproportionately impacted J.A., a member of a protected class under Section 504, causing ongoing injury by effectively barring him from participating in his computer/technology-based IEP transition plan for the remainder of his academic career with CCSD.

55. The ALJ only makes conclusory statements claiming the Plaintiff's failed to meet their burden.

## IV. RELIEF

## COUNT I

## Appeal of IDEA State Administrative Decision

56. Based upon all of the facts, and the violations of the IDEA, ADA and Section 504 of the Rehabilitation Act, Plaintiffs seek:

A. Review by this Court of the administrative record in the underlying state due process proceedings;

B. An opportunity to present the Court with additional evidence as contemplated in 20 USC §1415(i)(2)(C);

C. A manifestation review, via direct evidence and appeal;

D. Removal from the Defendant's alternative school;

E. An appropriate Individualized Education Plan;

F. Compensatory Services/Including Private Services where necessary to provide J.A. a FAPE;

G. Provision of access to computers and technology essential for J.A.'s full participation in the IEP transition plan;

H. An order requiring CCSD to undergo comprehensive compliance training on IDEA, Section 504, ADA, and FERPA, in alignment with the requirements of 34 C.F.R. § 300.119.

I. An award of attorney's fees and costs;

**COUNT II**

**Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973**

57. J.A. is a person with a disability, a history of a disability, and is perceived as disabled pursuant to 42 U.S.C. §12102, and 29 U.S.C. §706. D.J. and

has a relationship and association with J.A. of which CCSD is aware, in that D.J. is the parent of J.A.

58. CCSD is a public entity in accordance with 42 U.S.C. §12131(1). It receives federal financial assistance pursuant to §504.

59. Plaintiffs are otherwise "qualified". 29 U.S.C. §794; 34 C.F.R. 104.3; 42 U.S.C. §12132; 34 C.F.R. 35.104.

60. CCSD is both a recipient of federal financial assistance and a "public entity" and thus subject to compliance with Section 504 and the ADA. 42 U.S.C. §12131(1)(B).

61. Defendant has intentionally, and with willful and malicious disregard of Plaintiff's federally protected rights, discriminated against Plaintiffs based on J.A.'s disabilities and/or D.J.'s association with a person with a disability. Defendant has acted in bad faith and exercised gross misjudgment.

62. Specifically, and without limitation, Defendant has refused to ensure that J.A. was able to participate in and access the benefits of its services and educational program in the same manner as his non-disabled peers.

63. CCSD failed to provide access and reasonably accommodate Plaintiffs, including J.A., and it failed to make reasonable modifications in the policies, practices, or procedures when the modifications were necessary to avoid discrimination. CCSD was required, but failed to consider J.A.'s unique needs for services, as well as all alternatives, prior to excluding him from its general educational programming. Neither accommodating J.A. nor modifying the

CCSD's applications of its policies, practices, or procedures so as to allow J.A.'s participation in the Defendant's educational program would have caused undue burden or constituted a fundamental change in the operations of the Defendant's programs. 28 C.F.R. 35.130(b)(7) and (8); 34 C.F.R. 104.35.

64. The Defendant, by its actions and inactions as described herein, has, intentionally, and with the willful and reckless disregard for the rights of Plaintiffs, failed to provide J.A. with a non-discriminatory public educational program which is designed to meet his unique needs. Contrary to the mandates of §504, the Defendant has intentionally and with reckless disregard, denied J.A. the benefits of equal opportunities to enjoy and participate in educational programs and services as compared with students who are not disabled. 29 U.S.C. §794.

65. Based upon all of the facts, and the violations of the ADA and Section 504 of the Rehabilitation Act, Plaintiffs seek:

A. An order that the Defendant modify its policies and practices to provide J.A. with educational access equal to his non-disabled peers;

B. An order that the Defendant provide evidence-based behavioral supports necessary for J.A. to access the Defendant's programs and services;

C. An order that the Defendant modify its policies and programs so that J.A. can access the Defendant's services and programs;

D. An order that the Defendant provide J.A. access to technology that his non-disabled peers enjoy;

E. An award of compensatory damages and reimbursement of costs and expenses; and,

F. An award of reasonable attorneys' fees and costs expended through the due process proceeding, and for this action.

Respectfully submitted,

/s/ Michael F. Braun
MICHAEL F. BRAUN (GA Bar No. 078492)
5016 Centennial Boulevard, Ste. 200
Nashville, TN 37209
(615) 378-8942
Email: mfb@braun-law.com